IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil No. 4:20-cv-00223 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | AMENDED VERIFIED COMPLAINT |
| | ) | FOR FORFEITURE *IN REM* |
| APPROXIMATELY $49,510.00 | ) | |
| IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, United States of America hereby files and serves this AMENDED VERIFIED COMPLAINT IN REM and alleges as follows:

## I.    NATURE OF THE ACTION

1.     This is an action to forfeit and condemn specific property to the use and benefit of the United States of America ("Plaintiff") due to its involvement in violations of 21 U.S.C. § 846 (attempt and conspiracy) and § 841(a)(1)(prohibited acts).

2.     The United States believes the Defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as money or a thing of value furnished or intended to be furnished by a person in exchange for a controlled substance, in violation of subchapter I – Control and Enforcement, of  Chapter 13 – Drug Abuse Prevention and Control, and Title 21 – Food and Drugs, of the United States Code, and proceeds traceable to such an exchange, and money used or intended to be used to facilitate any violation of said subchapter.

## II.    DEFENDANT *IN REM*

3.    The Defendant property is generally described as approximately $49,510.00 in U.S. Currency seized on April 18, 2018, in Worth County, Iowa.

4.    The Defendant property is in the custody of the Iowa Department of Public Safety.

## III.    JURISDICTION, VENUE, AND PROCEDURAL AUTHORITY

5.    This Court has jurisdiction over an action commenced by the United States as Plaintiff, pursuant to 28 U.S.C. § 1345.

6.    This Court has original jurisdiction over this action for the recovery or enforcement of a fine, penalty, or forfeiture incurred under an Act of Congress, pursuant to 28 U.S.C. § 1355(a).

7.    This Court also has jurisdiction over this action because acts or omissions giving rise to this civil forfeiture occurred in the Southern District of Iowa, therefore, this action may be brought in this District, pursuant to 28 U.S.C. § 1355(b)(1)(A).

8.    Venue is proper in this District because this is a civil proceeding for the recovery of a pecuniary fine, penalty, or forfeiture, and is being prosecuted in the District where the action accrues and where the Defendant property is found, as authorized by 28 U.S.C. § 1395(a) and (b).

9.    Venue is also generally proper in this District under 28 U.S.C. § 1391(b)(2) because it is where "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of

2

the action is situated."

10.    The general rules for civil forfeiture proceedings are set forth in 18 U.S.C. § 983.

## IV.  FACTS

11.    The "Controlled Substances Act" was enacted by Congress as Title II of the "Comprehensive Drug Abuse Prevention and Control Act of 1970," Pub.L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801-904).

12.    The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

13.    Schedule I substances have a high potential for abuse, and have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of these drugs under medical supervision. 21 U.S.C. § 812(b)(1)(A) – (C).

14.    Marijuana, or Cannabis, is a psychoactive drug from the Cannabis plant. The main psychoactive component of cannabis is tetrahydrocannabinol (THC), which is one of the 483 known compounds in the plant, including at least 65 other cannabinoids. Cannabis can be used by smoking, vaporizing, within food, or as an extract.  Cannabis has mental and physical effects.  It causes a "high", or stoned feeling and other effects, including a general change in thought and perception, difficulty concentrating, impaired short-term memory, altered sense of time, impaired body movement, relaxation, and an increase in appetite,  Marijuana is a

Schedule I controlled substance.

15.     Schedule II substances have a high potential for abuse, but the drugs or substances have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.  Abuse of Schedule II controlled substances may lead to severe psychological or physical dependence 21 U.S.C. § 812(b)(2)(A) – (C).

16.     Cocaine is a powerfully addictive stimulant drug made from the leaves of the coca plant native to South America. Cocaine acts by inhibiting the reuptake of serotonin, norepinephrine, and dopamine, which causes greater concentrations of these three neurotransmitters in the brain. Cocaine is addictive due to its effect on the reward pathway in the brain. It is commonly snorted, inhaled as smoke, or dissolved and injected into a vein.  After a short period of use, there is a high risk that dependence will occur.  The mental effects of cocaine may include loss of contact with reality, an intense feeling of happiness, or agitation. The physical symptoms may include a fast heart rate, sweating, and large pupils.  Cocaine use increases the risk of stroke, myocardial infarction, lung problems in those who smoke it, blood infections, and sudden cardiac death. The use of high doses can result in very high blood pressure or body temperature.  Effects begin within seconds to minutes of use and last between five and ninety minutes. Cocaine has a small number of accepted medical uses, such as numbing and decreasing bleeding during nasal surgery. Cocaine is a Schedule II controlled substance.

17.    Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute a controlled substance unless authorized by law to do so.  21 U.S.C. § 841(a)(1).

18.    Under the Controlled Substances Act, it is unlawful to conspire with others to violate its prohibitions.  21 U.S.C. § 846.

19.    The Defendant property is money furnished, or intended to be furnished, in exchange for a controlled substance, proceeds traceable to such an exchange, and/or money used or intended to be used to facilitate a violation of Subchapter I, Part D, Title 21, United States Code, namely, the conspiracies charged in *United States v. Lampe, Vang, Snyder, Karnowski, Lampe*, et al., No. 4:19-CR-00018 (S.D. Iowa).

20.    None of the persons involved in the conspiracy to distribute controlled substances involved in this matter were authorized by federal law to possess or distribute controlled substances.

21.    On January 24, 2019, Robert William Lampe III, Tan Fong Vang, Mason Leroy Snyder, Alyssa Jean Karnowski, Robert Joseph Lampe, Jr., Charley Vang, and Sindy Xiong were indicted by a federal grand jury in the U.S. District Court for the Southern District of Iowa for their involvement in a conspiracy to distribute marijuana, that existed at least from approximately April 2018 to approximately November 2018.

22.    On January 24, 2019, Robert William Lampe III, and Mason Leroy Snyder ("Snyder") were indicted by a federal grand jury in the U.S. District Court for the Southern District of Iowa for their involvement in a conspiracy to distribute

cocaine, which existed at least from approximately April 2018 to approximately November 2018.

23.   On February 21, 2019, the pending indictment was superseded and Austin Eugene Brommel was added to the marijuana conspiracy charge.

24.   On February 21, 2019, the pending indictment was superseded and Austin Eugene Brommel was added to the cocaine conspiracy charge.

25.   On March 12, 2019, Snyder entered into a plea agreement to plead guilty to the marijuana conspiracy charge, and to possessing marijuana with the intent to distribute.  As part of his Plea Agreement, Snyder agreed he conspired with Lampe and Tan Fong Vang, among others, to distribute marijuana illegally in the Southern District of Iowa.

26.   As part of his Plea Agreement, Snyder truthfully admitted that, as part of the conspiracy, he would travel to Minneapolis, Minnesota, among other places, to acquire multi-pound quantities of marijuana from Tan Fong Vang, which Snyder then brought back to the Des Moines, Iowa area to sell.

27.   On March 14, 2019, Snyder pled guilty to conspiracy to distribute 100 kilograms of a mixture, and admitted the facts set forth in his Plea Agreement.  He admitted travelling to Minneapolis, Minnesota to get marijuana, for her and his colleagues to sell in the greater Des Moines metropolitan area.  He admitted to having money constituting drug proceeds or money used or intended to be used to facilitate the drug conspiracy.

28.     On July 25, 2019, Snyder was sentenced to 120 months' in federal prison for his role in the drug conspiracy.

29.     The Defendant property is money generated from, and intended to be used in, the drug-dealing conspiracy to which Snyder pled guilty.

30.     On May 14, 2019, a Third Superseding Indictment was returned, adding Brett Allan Corrigan, Jr. to the marijuana conspiracy charge.

31.     On May 14, 2019, a Third Superseding Indictment was returned, adding Kasey Lee Cassady to the cocaine conspiracy charge.

32.     On May 16, 2019, Karnowski pled guilty to conspiracy to distribute 100 kilograms of a mixture and substance containing marijuana, and to distributing marijuana. She admitted she was a courier of drug money for members of the conspiracy, driving drug money from Iowa to Minnesota. On September 27, 2019, she was sentenced to 46 months in federal prison for her role in the drug conspiracy.

33.     On May 29, 2019, Lampe entered into a Plea Agreement, and pursuant thereto pled guilty on June 3, 2019 to the conspiracy to distribute marijuana charge, as well as to other charges related to his illegal possession and distribution of marijuana, cocaine, and psilocybin.   In the Plea Agreement, Lampe truthfully admitted he obtained marijuana from Tan Fong Vang in Minneapolis, Minnesota, and distributed it with Snyder and others in the greater Des Moines, Iowa metropolitan area, and engaged in other illegal acts.   Lampe was sentenced on January 13, 2020 to 73 months in federal prison.

34.     Brommel pled guilty on August 12, 2019 to conspiracy to distribute 100 kilograms of a mixture and substance containing marijuana. He sold marijuana he obtained from Lampe. Brommel was sentenced on January 13, 2020 to 60 months in federal prison.

35.     On August 15, 2019, Bruns pled guilty to engaging in a monetary transaction derived from the proceeds of the drug distribution conspiracy. Specifically, he knowingly engaged in a financial transaction of over $65,000 in proceeds of the conspiracy. Bruns was sentenced on December 18, 2019 to 15 months in federal prison.

36.     On August 19, 2019, Cassady pled guilty, pursuant to a plea agreement, to conspiracy to distribute at least 500 grams of a mixture and substance containing cocaine. He conspired with Lampe, Brommel, and Snyder, among others to obtain cocaine from out-of-state and distribute it in Iowa. He has yet to be sentenced.

37.     On August 22, 2019, Lampe, Jr. pled guilty to conspiracy to distribute marijuana and being a felon in possession of a firearm. He had previously been convicted in the Iowa District Court for Polk County of possession of methamphetamine with the intent to deliver, though he was also charged with possessing marijuana with the intent to deliver, Lampe, Jr. admitted letting members of the conspiracy use his residence in Des Moines as a stash house for marijuana and drug proceeds related to the conspiracy. He also assisted with the receipt of marijuana at his residence, as part of the conspiracy. Lampe, Jr. also secured a new marijuana source for the conspiracy, which supplied them with pound

quantities. He had over $49,510 in proceeds from the conspiracy stored at his residence on August 9, 2018. He was sentenced on January 6, 2020 to 70 months in federal prison.

38.    On November 8, 2019, Corrigan pled guilty, pursuant to a plea agreement, to conspiracy to distribute marijuana. Corrigan obtained marijuana from Lampe, and distributed it to others. He was sentenced on March 27, 2020 to 60 months in federal prison.

39.    On November 14, 2019, Xiong pled guilty, pursuant to a Plea Agreement, to conspiracy to distribute marijuana. She admitted she assisted with the Minneapolis (Brooklyn Park), Minnesota part of the conspiracy. She and her colleagues were in possession of over 294 pounds of marijuana on November 20, 2018. She was sentenced on March 27, 2020 to 21 months in federal prison.

40.    On November 14, 2019, Charley Vang pled guilty to conspiracy to distribute marijuana. He assisted his son, Tan, and his wife, Xiong, in supplying marijuana to the conspiracy. He was sentenced on March 27, 2020 to 30 months in federal prison.

41.    On December 30, 2019, Tan Fong Vang pled guilty to being part of the conspiracy to distribute marijuana. He was convicted at a jury trial on January 3, 2020 of possessing a firearm in furtherance of a drug trafficking crime. He supplied the conspiracy with marijuana, with the assistance of his mother, Xiong, and his father, Charley Vang. On May 7, 2020, he was sentenced to 170 months in federal prison.

42.     In approximately February 2018, Lampe began purchasing marijuana from JD in the greater Des Moines, Iowa metropolitan area.

43.     Snyder was JD's connection to a Minneapolis, Minnesota-area source for marijuana, and would, at times, pick up loads of marijuana for JD.

44.     Thereafter, Brommel introduced Lampe and Snyder, who were both living at the same apartment complex.

45.     After JD was arrested and imprisoned on state drug charges, Lampe and Snyder assumed his drug distribution operation, including the Minnesota source of supply, Tan Fong Vang.

46.     Thereafter, Snyder, Lampe, and/or Karnowski traveled to Minnesota to pick up loads of marijuana from Vang or one of his family members, including his mother, Sindy Xiong, and his father, Charley Vang.

47.     Snyder, Lampe, and/or Karnowski would also drive to Minnesota with large amount of cash to pay Vang their drug debt for purchasing marijuana from him and his associates.

48.     At times, Snyder, Lampe, or Karnowski transported tens of thousands of dollars of proceeds of the drug-dealing proceeds to Vang in Minneapolis.

49.     Eventually, in 2018, Lampe and Snyder also started acquiring cocaine from several different sources and redistributing it in the Des Moines area.

50.     Brommel delivered marijuana and cocaine for Lampe and Snyder, and had his own customers for the marijuana and cocaine.

51.     Lampe and Snyder used the residence of Lampe's father, Lampe Jr., to store drugs and cash.

52.     Lampe Jr. purchased drugs from Lampe and Snyder and also introduced Lampe to a California marijuana source after Lampe could no longer purchase marijuana from Tan Fong Vang because Lampe owed a drug debt he could not, or did not, pay.

53.     The drug dealing conspiracy used several additional stash houses for drugs, including a residence that Snyder and Lampe purchased from Douglas Bruns using drug proceeds.

54.     On April 18, 2018, law enforcement assisted Snyder when he was stranded on Interstate 35 near the 105 mile marker exit ramp in Worth County, Iowa.

55.     Snyder was the only occupant of the vehicle, and chose to provide law enforcement with a false name.

56.     During this stop, law enforcement eventually discovered Snyder's real identity, and learned his driving status was barred.  He was lawfully arrested.

57.     An inventory search of Snyder's vehicle was lawfully conducted.  In the vehicle, law enforcement located the Defendant property in the center console and in ten bundles inside a small suitcase on the passenger side floor.  In total, there was approximately $49,510 in cash.  One of the bundles was labeled with the name "Mason."

58.     During the lawful inventory search, law enforcement also located a burnt marijuana cigarette under the front passenger seat, as well as four 9mm rounds

of ammunition in the center console.

59.    In a post-*Miranda* statement, Snyder falsely stated that the money came from gambling proceeds, as well as a motorcycle sale.

60.    When law enforcement disputed this story, Snyder admitted he had not won the money gambling, but would not tell law enforcement from where the money came.

61.    Snyder told law enforcement he was not worried about losing the money and that he took trips to Minnesota approximately every other week.

62.    The money was actually proceeds of the conspiracy that Snyder was transporting to Minnesota to, at least in part, pay off drug debts to Tan Fong Vang and/or his associates.

63.    On April 18, 2018, Snyder executed an Iowa Division of Narcotics Enforcement "Disclaimer of Ownership of Assets & Waiver of Rights to Notice of Seizure," in which he acknowledged (a) the Defendant currency had been seized by the Department of Public Safety; (b) he was the owner of the $50,300 in U.S. Currency seized; (c) he come into possession of the money due to "misc. items sold"; and (d) he understood that by signing the document the money may be forfeited and he would be precluded from asserting a claim in certain forfeiture proceedings.

64.    Later that day, Lampe and Karnowski arrived at the Worth County Jail to post Snyder's bond and secure his release.

65.    They provided two, $1,000 stacks of rubber-banded money, which strongly reeked of marijuana, to post the bond. This money was, also, was proceeds

of the offense.

66.     Unbeknownst at the time to Lampe and his associates, members of the conspiracy sold marijuana and cocaine to persons working with law enforcement on April 24, 2018, May 2, 2018, May 9, 2018, May 29, 2018, June 14, 2018, July 12, 2018, October 17, 2018, and January 9, 2019.

67.     At one point in the conspiracy, Lampe told a customer, "I move like 100 [pounds] a week" and Lampe advertised having three different strains of marijuana for sale.

68.     Lampe also told a customer he was receiving 50 to 75 pounds of marijuana per week and that his source of supply was an Asian male (Tan Fong Vang) who had a grow operation four hours away.  Lampe advised the same customer he had cocaine, but it was expensive.  Lampe said he was purchasing ounce quantities of cocaine for $1,700 per ounce.

69.     At another point in the conspiracy, Karnowski told a customer they only had a gram of cocaine left, but should be getting more the next day.

70.     At another point in the conspiracy, Lampe informed a customer that Snyder, who he said was his "driver," had recently arrived with marijuana and was currently on his way to Miami, Florida, to pick up a shipment of cocaine.  Lampe admitted to selling 100 pounds of marijuana in three days.

71.     In approximately June 2019, Lampe and Snyder bought the residence as 4665 Beaver Avenue in Des Moines, Iowa, at least in part, with proceeds of the conspiracy.

72. As part of the purchase for this residence, Lampe and Snyder made a $100,000 cash down payment to Bruns with proceeds of the conspiracy. The cash was mostly in 20-dollar bills, and it took Bruns approximately an hour to count it.

73. On August 9, 2018, federal search warrants were executed at several residences associated with the Lampe and Snyder drug trafficking organization.

74. Specifically, search warrants were executed on August 9, 2018 at 4665 Beaver Avenue, Des Moines (Lampe and Karnowski's residence); 408 Arthur Avenue, Des Moines (Lampe Jr.'s residence); 1165 Olsen Drive, Apartment 303, Waukee (Snyder's residence); and elsewhere.

75. At the search of Lampe and Karnowski's residence (4665 Beaver Avenue), law enforcement discovered them inside the residence.

76. As a result of this search, law enforcement seized 74 grams of marijuana and THC wax with packaging, 55 grams of marijuana edibles, mushrooms, miscellaneous unknown pills, $5,136 in cash, two digital scales, a vacuum heat-sealer, packaging materials, a bullet proof vest, firearms case with receipts, drug paraphernalia, two cell phones, and a video surveillance system.

77. The foregoing items constitute indicia of, or tools of, the drug-dealing trade, and evidence of the illegal drug-dealing conspiracy in this matter.

78. At Lampe Jr.'s residence (408 Arthur Avenue, Des Moines), law enforcement discovered approximately eight mason jars containing marijuana, 47 grams of THC wax in a plastic container, three prescription pill bottle containing

marijuana, a pill bottle containing cocaine, several pill bottles (with Snyder's name on them) containing unknown pills, a Ziploc baggie containing marijuana, 19.9 grams of mushroom, a bag containing various items of packaging, marijuana edibles, and approximately 91 grams of marijuana, additional packaging, including heat-sealed baggies, drug paraphernalia, a digital scale, indicia for Lampe Jr., drug notes, and a total of $50,661 in cash. In the basement of the residence in a closet, law enforcement officers located two black powder rifles and a Marlin, model 60W, .22 caliber rifle (serial number 09323667). Scattered throughout the residence were approximately 520 rounds of miscellaneous ammunition.

79.    The foregoing items constitute indicia of, or tools of, the drug-dealing trade, and evidence of the illegal drug-dealing conspiracy involved in this matter.

80.    At Snyder's residence (1165 Olsen Drive, Apartment 303, Waukee), law enforcement encountered Snyder and another person in the apartment. Law enforcement officers seized 1.34 grams of cocaine, 4.79 grams of MDMA, 2.49 grams of marijuana, a prescription pill bottle for Snyder containing 1,272 green pills inside baggies, drug paraphernalia, a digital scale, a box of 9mm ammunition containing 14 rounds, and $13,900 in cash.

81.    The foregoing items constitute indicia of, or tools of, the drug-dealing trade, and evidence of the illegal drug-dealing conspiracy involved in this matter.

82.    Law enforcement officers conducted post-*Miranda* interviews of several individuals encountered during the execution of the search warrants.

83.    During a voluntary, post-*Miranda* interview, Lampe told law

enforcement officers that Snyder was involved in marijuana dealing.

84.     During the voluntary, post-*Miranda* interview, Karnowski eventually admitted she sold pound quantities of marijuana for Lampe, who used drivers to obtain and deliver the marijuana for him.

85.     During a voluntary, post-*Miranda* interview, Snyder told law enforcement officers that during the April 2018 traffic stop, the money seized (the Defendant property) belonged to a dealer of illegal controlled substances, JD. Snyder was traveling to the Minneapolis area to pick up marijuana, and the money was the payment for it.  JD put the money in Snyder's trunk and the source in Minneapolis would remove the money and then put the drugs in Snyder's trunk.

86.     During the voluntary, post-*Miranda* interview, Snyder said most of the time, Snyder just drove to an address provided to him by JD to pick up marijuana, and he delivered it, as directed, to a house in Windsor Heights, Iowa.  Snyder worked with JD from approximately February 2018 until April or May 2018, when JD was arrested.  After JD was arrested, the Minneapolis source gave Snyder his number so Snyder could continue obtaining drugs.

87.     During the voluntary, post-*Miranda* interview, Snyder stated he and Lampe were equal partners in their drug-dealing organization, and had been partners from approximately May to July 2018.  Once JD was arrested, Snyder told Lampe he could start obtaining drugs from the Minneapolis source for him.

88.     During the voluntary, post-*Miranda* interview, Snyder truthfully admitted to making trips to Minneapolis area approximately once or twice per week,

for a total of 20 to 30 times, obtaining approximately 20 to 60 pounds of marijuana per week for the conspiracy. Snyder delivered marijuana at the Beaver Avenue residence, Lampe Jr.'s residence, Lampe's mother's house, and Brommel's apartment. Lampe also obtained cocaine from another source in the Des Moines, Iowa, area. Snyder admitted that he made trips for Lampe to Florida to pick up cocaine for Lampe. Snyder advised that Lampe held the money from the drug sales, and when Snyder needed money he went to Lampe and obtained money.

89.    During the voluntary, post-*Miranda* interview, Snyder truthfully admitted that, during the conspiracy, Lampe sold marijuana and cocaine from wherever he was living at the time. Lampe also sold drugs from hotels. Lampe and Snyder used the garage at the Beaver Avenue residence to store marijuana that they later sold.

90.    Snyder's cell phone contained numerous drug-related communication, including confirmation of drug sales, transfers of cash, and arrangement of trips to pick up loads of drugs.

91.    Lampe and Snyder frequently arranged drug sales via Snapchat postings, and also advertised available drug products for sale.

### V.    COUNT ONE – DEFENDANT APPROXIMATELY $49,510.00 (FORFEITURE UNDER 21 U.S.C. § 881(a)(6))

92.    Plaintiff repeats and realleges each and every allegation set forth above.

93.    A preponderance of the evidence proves that the Defendant property constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange, and

money used or intended to be used to facilitate one or more violations of 21 U.S.C. § 841 and § 846 et seq.

94.     As a result of the foregoing, the Defendant property is liable to condemnation and to forfeiture to the United States for its use, in accordance with 21 U.S.C. § 881(a)(6).

## VI.   CLAIM FOR RELIEF

WHEREFORE, the United States prays that the Defendant property be forfeited to the United States and that it be awarded its costs and disbursements in this action and for such other and further relief as the Court deems proper and just.

Respectfully submitted,

Marc Krickbaum
United States Attorney

By:     /s/ Craig Peyton Gaumer
Craig Peyton Gaumer
Assistant United States Attorney
U. S. Courthouse Annex, Suite 286
110 East Court Avenue
Des Moines, Iowa 50309
Tel: (515) 473-9317
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, Robert Carlson, hereby verify and declare under penalty of perjury that I am a Special Agent with the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and that I have read the foregoing Amended Verified Complaint and know the contents thereof and the matters contained in the Amended Verified Complaint are true to my own knowledge, except for those matters not within my own personal knowledge and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the United States and other law enforcement agencies working with the ATF in this matter, including  information provided to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with the ATF.

Dated:  July 21, 2020.

Robert Carlson, Special Agent
U.S. Bureau of Alcohol, Tobacco,
Firearms, and Explosives